UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BURNELL HOLLAND AND MARILYN HOLLAND          :
AS PERSONAL REPRESENTATIVES OF               :
THE ESTATE OF ANGELA HOLLAND                 :
12905 Cloverly Drive                         :
Upper Marlboro, MD 20774                     :
                                             :
            Plaintiff                        :
                                             :
v.                                           :
                                             :
BAYER CORPORATION                            :
100 Bayer Road                               :
Pittsburgh, Pennsylvania 15205               :
                                             :
and                                          :
                                             :
BAYER HEALTHCARE PHARMACEUTICALS, Inc.       :
67 Whippany Road                             :
Whippany, NJ 07981                           :
                                             :
and                                          :
                                             :
BAYER HEALTHCARE, LLC                        :
555 White Plains Road                        :
Tarrytown, NY 10591                          :
                                             :
and                                          :
                                             :
BAYER PHARMA AG                              :
100 Bayer Road                               :
Pittsburgh, Pennsylvania 15205               :
                                             :
and                                          :
                                             :
BARR PHARMACEUTICALS, LLC                    :
225 Summit Avenue                            :
Montvale, NJ 07645                           :
                                             :
and                                          :
                                             :
BARR LABORATORIES, INC.                      :
225 Summit Avenue                            :
Montvale, NJ 07645                           :

**and**                                                  :

**TEVA PHARMACEUTICAL INDUSTRIES, INC.**                 :
**1090 Horsham Road**                                    :
**North Wales, PA 19454**                                :
                                                         :
**and**                                                  :
                                                         :
**McKESSON CORPORATION**                                 :
**1 Post Street**                                        :
**San Francisco, CA 94104**                              :
                                                         :
      **Defendants**       :

## COMPLAINT

### JURISDICTION AND VENUE

1.      This court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2.      Venue is proper in the District of Columbia because it is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.  Decedent resided in and died in the District of Columbia.  The District of Columbia is where the Decedent was prescribed, purchased, and consumed Gianvi.

### PARTIES

3.      Burnell and Marilyn Holland are the parents of Angela Holland.  They are also the personal representatives of the Estate of Angela Holland.  Plaintiffs are residents of Maryland.

4.      At the time of her death, Angela Holland was a resident of the District of Columbia.

5.      Defendant Bayer Corporation is a corporation formed in the State of Indiana with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.  Defendant Bayer

Corporation is the sole member of Bayer Healthcare LLC, which owns 100% of Schering Berlin, Inc., which owns 100% of Defendant Bayer HealthCare Pharmaceuticals, Inc. As such, Defendant Bayer Corporation is a parent corporation of Defendant Bayer Healthcare Pharmaceuticals, Inc.

6.   At relevant times, Defendant Bayer Corporation was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Yaz/Yasmin/Gianvi.

7.   Defendant Bayer Healthcare Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 67 Whippany Road, Whippany, NJ 07981.

8.   Bayer Healthcare Pharmaceuticals Inc. was created by the integration of Bayer Healthcare and Berlex Laboratories. As such, Defendant Bayer Healthcare Pharmaceuticals Inc. is liable for the actions and omissions of Berlex Laboratories International, Inc. Defendant Bayer Healthcare Pharmaceuticals Inc. is the U.S.-based pharmaceuticals unit of Schering Berlin, Inc. and is a division of Bayer AG.

9.   Defendant Bayer Healthcare Pharmaceuticals Inc. is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Yaz/Yasmin/Gianvi.

10.   Defendant Bayer Healthcare, LLC is a Delaware limited liability corporation with its principal place of business at 555 White Plains Road, Tarrytown, New York 10591.

11.   Defendant Bayer Healthcare, LLC is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing

into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Yaz/Yasmin/Gianvi.

12.     Bayer Pharma AG, formerly known as Bayer Schering Pharma AG, formerly known as Schering AG, is a pharmaceutical company that is organized and existing under the laws of the Federal Republic of Germany, having a principal place of business at Müllerstrasse 178, 13353 Berlin, Germany.  Defendant Bayer Pharma AG's headquarters and principal place of business in the United States is located at 100 Bayer Road, Pittsburg Pennsylvania 15205.

13.     Bayer Pharma AG is a corporate successor of Schering AG and Bayer Schering Pharma AG. Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006. Bayer Schering Pharma AG was renamed Bayer Pharma AG effective July 1, 2011.

14.     Defendant Bayer Pharma AG. is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Yaz/Yasmin/Gianvi.

15. Defendants Bayer Corporation, Bayer Healthcare Pharmaceuticals, Inc., Bayer Healthcare, LLC., and Bayer Pharma AG will be collectively referred to as the "Bayer Defendants."

16. Upon information and belief, at all relevant times, the Bayer Defendants were present and doing business in the District of Columbia.

17. At all relevant times, the Bayer Defendants transacted, solicited, and conducted business in the District of Columbia and derived substantial revenue from such business.

18. Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation having its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania 19454.

19. Defendant Barr Pharmaceuticals, LLC ("Barr Pharmaceuticals"), formerly known as Boron Acquisition, LLC, is a Delaware limited liability company having its principal place of business at 225 Summit Avenue, Montvale, New Jersey, 07645. Defendant Barr Pharmaceuticals developed, manufactures and markets generic pharmaceutical products through its operating subsidiary, Barr Laboratories, Inc. On information and belief, Barr Pharmaceuticals is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd.

20. Defendant Barr Laboratories, Inc. ("Barr Labs") is a Delaware corporation having its principal place of business at 225 Summit Avenue, Montvale, New Jersey 07645. On information on belief, Barr Labs is a wholly-owned subsidiary of Defendant Barr Pharmaceuticals, and the two have common officers and directors.

21. Defendants Teva, Barr Pharmaceuticals and Barr Labs are engaged in the business of researching, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly, through third parties or related entities, its products, including the prescription drug Gianvi, which is a generic form of the prescription drug Yaz.

22. Defendant Barr Laboratories, Inc., Barr Pharmaceuticals, LLC , and Teva Pharmaceuticals USA, Inc. will be collectively referred to as the "Barr Defendants."

23. Upon information and belief, at all relevant times, the Barr Defendants were present and doing business in the District of Columbia.

24. At all relevant times, the Barr Defendants transacted, solicited, and conducted business in the District of Columbia and derived substantial revenue from such business.

25. Defendant McKesson Corporation ("McKesson") is a Delaware medical supply management corporation with its principal place of business located at One Post Street, San

Francisco, California 94104, and is and was at all times mentioned herein qualified to do business in the District of Columbia.

## FACTS

26. At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Yaz/Yasmin/Gianvi for use as a combination oral contraceptive.

27. Yasmin, the predecessor to YAZ, first received FDA approval in 2001 as a combination oral contraceptive.

28. Each tablet of Yasmin is composed of a combination of 3 mg of the progestrin, drospirenone, and 0.03 mg of the estrogen, ethinyl estradiol.

29. Yaz received FDA approval in 2006 as a combination oral contraceptive.

30. Yaz is almost identical to Yasmin, but each tablet of YAZ is composed of the combination of 3 mg of the progestrin, drospirenone, and only .02 mg of the estrogen, ethinyl estradiol.

31. Gianvi is the generic version of Yaz.

32. The patient package insert and warnings label for Gianvi are substantially similar to the patient package insert and warnings label for Yaz.

33. Yaz/Yasmin/Gianvi are indicated for the prevention of pregnancy in women who use an oral contraceptive.

34. Combination birth control pills are referred to as combined hormonal contraceptives.

35. In April 2002, the British Medical Journal reported that the Dutch College of General Practitioners recommended that older second generation birth control pills be prescribed in lieu of Yasmin as a result of 40 cases of venous thrombosis among women taking Yasmin.

36. In February 2003, a paper entitled *Thromboembolism associated with the new contraceptive YAZ Yasmin* was published in the British Medical Journal detailing a Netherlands Pharmacovigilance Centre report of additional reports of thromboembolism where Yaz/Yasmin/Gianvi was suspected as the cause, including two deaths.

37. Upon information and belief, Adverse Event data maintained by the FDA indicates staggering, serious Adverse Events, including, but not limited to, heart arrhythmias, electrolyte imbalance, hyponatremis, hyperkalemia, hyperkalemic arrhythmias, atrial fibrillation, tachycardia, bradycardia, myocardial infarction, stroke, transient ischemic attack, blood clots, embolisms, and/or sudden death for Yaz/Yasmin/Gianvi.

38. Defendants have marketed their drug Yaz/Yasmin/Gianvi as effective for the treatment of premenstrual dysphoric disorder (hereinafter referred to as "PMDD"), premenstrual syndrome (hereinafter referred to as "PMS") and moderate acne, in addition to its FDA approved use as an oral contraceptive, and that it lacks certain side effects, such as weight gain, bloating and water retention, common to other oral contraceptives.

39. Defendants have been warned at least three times by the FDA; in 2003, 2008 and 2009, for misleading the public through use of television advertisements which overstate the efficiency of Yaz/Yasmin/Gianvi and minimize serious risks associated with the drug.

40. The use of Yaz/Yasmin/Gianvi has a prothrombotic effect resulting in the development of thromboses, such as pulmonary emboli and deep vein thrombosis.

41. Defendants ignored the correlation between the use of Yaz/Yasmin/Gianvi and the increased risk of developing thromboses, despite the wealth of scientific and medical evidence available.

42. Studies that were done prior to FDA approval, however, indicate that drospirenone has certain effects that are different from those of traditional second generation progestins, and potentially more dangerous.

43. Drospirenone interacts differently with ethinyl estradiol compared to other progestins, such that it does not sufficiently counterbalance the clotting effects of estrogen as do other progestins, particularly the second generation progestins.

44. Drospirenone causes an increase in potassium levels in the blood, which can lead to a condition known as hyperkalemia if the potassium levels become too high.

45. Hyperkalemia can cause heart rhythm disturbances, such as extrasystolies, pauses, or bradycardia. If left untreated, hyperkalemia can be fatal.

46. If hyperkalemia disrupts the normal heart rhythms, the flow of blood through the heart can be slowed to the point that it permits blood clots to form. Blood clots in the heart can then lead to heart attacks, or the clots can break off and travel to the lungs where they can cause pulmonary embolism, or can travel to the brain causing stroke.

47. The use of drospirenone, a diuretic, in Yaz/Yasmin/Gianvi creates unique and dangerous risks compared to other oral contraception. These risks include, including *inter alia* heart arrhythmias, myocardial infarction, and other adverse cardiovascular events, including sudden death, stroke, transient ischemic attack, embolisms, blood clots, kidney and/or gallbladder disease.

48. Upon information and belief, drospirenone acts as a diuretic, where it goes into the kidney and blocks aldosterone, a hormone that increases the reabsorption of sodium and water and secretes potassium, causing dehydration.

49. Upon information and belief, the use of drospirenone in Yaz/Yasmin/Gianvi and the blockage of aldosterone causes an imbalance in electrolytes by reducing sodium, a condition known as hyponatremis, and increasing potassium, a condition known as hyperkalemia, which may lead to serious and potentially fatal conditions known as hyperkalemia arrhythmia, myocardial infarction, stroke, transient ischemic attacks, blood clots, embolisms, and/or sudden death.

50. Upon information and belief, hyperkalemia arrythmias are also associated with blood clots and/or thrombotic events such as a stroke, deep vein thrombosis, pulmonary embolism or heart attack.

51. The Defendants did not provide adequate warnings to doctors, the health care community and the general public about the increased risk of serious adverse events that are described herein and that have been repeated by the medical community.

52. In fact, in less than a five-year period, from the first quarter of 2004 through the third quarter of 2008, over 50 reports of death among users of Yaz and Yasmin have been filed with the FDA.

53. These reports include deaths associated with cardiac arrhythmia, cardiac arrest, intracardiac thrombus, pulmonary embolism, and stroke in women in their child bearing years.

54. Some deaths reported occurred in women as young as 17 years old.

55. Significantly, reports of elevated potassium levels are frequently included among the symptoms of those suffering death while using Yaz or Yasmin.

56. Significantly, reports of elevated potassium levels are frequently included among the symptoms of those suffering death while using Yaz or Yasmin.

57. Two recent studies, released in August 2009, have found significantly increased risks of harm associated with Yasmin or Yaz over other types of birth control pills. The first study assessed the risk of developing venous thrombosis in woman who use oral contraception. The woman ranged in age from 15 to 49 and had no history of heart disease or any malignant condition. The study found that of the 3.3 million women taking oral contraceptives, there were 4,213 venous thrombotic events. Of this total, 2,045 occurred in women using drospirenone oral contraceptives. The study concluded that "oral contraceptives with ...drospirenone were associated with a significantly higher risk of venous thrombosis than oral contraceptives with evonogesterel." Lidegard, et al., *Hormonal contraception and risk of venous thromboembolism: national follow up study,* The British Medical Journal 2009, 330:B2921.

58. The second study found that Yasmin or Yaz users have twice the risk of a clotting event than users of birth control pills that contain levonorgestral. Vandenbroucke, et al., *The venous thrombotic risk of oral contraceptives, effects of estrogen dose and progestin type: results of the MEGA case-control study,* The British Medical Journal 2009, 339:B2921.

59. Despite the wealth of scientific evidence, Defendants have not only ignored the increased risk of the development of the aforementioned injuries associated with the use of Yasmin and Yaz, but they have, through their marketing and advertising campaigns, urged women to use Yasmin or Yaz instead of birth control pills that present a safer alternative.

60. Defendants Barr Laboratories, Inc. and Teva Pharmaceuticals USA, Inc. distribute, supply, sell, market, and/or introduce into interstate commerce, either directly or indirectly through

10

third parties or related entities, the prescription oral contraceptive Gianvi, which is the generic form of Yasmin/Yaz.

61. According to Bayer's 2008 Annual Report, in April of 2005 Bayer filed suit against Barr Laboratories, Inc. alleging patent infringement by Barr for the intended generic version of Yasmin. In response, Barr Laboratories, Inc. filed a counterclaim against Bayer seeking to invalidate Bayer's patent for Yasmin/Yaz. In March of 2008, the U.S. District Court for the District of New Jersey decided the matter and invalidated Bayer's patent for Yasmin/Yaz.

62. Although Bayer appealed the federal court's ruling, in June of 2008 Bayer and Barr Laboratories entered into a supply and licensing agreement for a generic version of Yasmin/Yaz covering the United States. Under the agreement, Bayer supplies Barr with a generic version of Yasmin/Yaz, which Barr markets solely in the United States under the name Gianvi. In return, Barr pays Bayer a fixed percentage of its revenues from Gianvi sales.

63. Bayer ultimately lost its appeal on August 5, 2009, when the United States Court of Appeals for the Federal Circuit entered its opinion upholding the decision of the District of New Jersey and confirming the invalidity of Bayer's patent for Yasmin/Yaz.

64. Bayer continues to manufacture the generic form of Yasmin/Yaz for Barr, which is marketed and sold under the name Gianvi.

65. The patient package insert and warnings label for Gianvi bears the name Barr Laboratories, Inc.; however it is essentially the same as the patient package insert and warnings label for Yasmin/Yaz.

66. According to the publication Drug Topics, in 2008, while Yaz was ranked 28th and Yasmin ranked 56th, Gianvi was ranked 96th among the top 200 branded drugs by total prescriptions.

67. Therefore, both the Bayer defendants and the Barr defendants have benefited and will continue to benefit economically in light of Gianvi's large market share, and they bear liability for any harm caused by the product.

68. Additionally, pursuant to an agreement reached in June of 2008, Bayer has agreed to grant Barr a license to market a generic version of Yaz in the United States starting in July 2011. Under the agreement, Bayer will supply Barr with the product which Barr will market under a generic name.

69. Defendants market Yaz/Yasmin/Gianvi as providing the same efficacy as other birth control pills in preventing pregnancy, but with additional benefits.

70. However, because Yaz/Yasmin/Gianvi contain the fourth generation progestin drospirenone, they present additional health risks not associated with other birth control pills.

71. On July 10, 2003, the FDA objected to the characterization that drospirenone was a benefit compared to the progestin used in other combined oral contraceptives and issued a warning letter stating, "FDA is not aware of substantial evidence of substantial clinical experience demonstrating that Yasmin is superior to other COCs or that the drospirenone in Yasmin is clinically beneficial. On the contrary, FDA is aware of the added clinical risks associated with drospirenone."

72. The FDA's warning letter continued by stating that the advertisement failed "to communicate that the potential to increase potassium is a risk" or that "increased serum potassium can be dangerous."

73. More recently, Defendants advertised that its product Yaz was indicated for treatment of premenstrual syndrome or "PMS," as opposed to the less serious condition of premenstrual dysphoric disorder or "PMDD."

74. Defendants also advertised that Yaz contained the added benefit of preventing or reducing acne.

75. In response, on October 3, 2008, the FDA issued another warning letter to Defendant Bayer for the misleading advertisement, reiterating that the marketing was misleading because it promoted Yaz for medical conditions beyond the limits of the FDA approval, and adding that "Yaz has additional risks because it contains the progestin, drospirenone ... which can lead to hyperkalemia in high risk patients, which may result in potentially serious heart and health problems."

76. The FDA further warned in its October 3, 2008 letter that Yaz "does not result in completely clear skin" and that Defendants' "TV Ads misleadingly overstate the efficacy of the drug."

77. Indeed, the FDA felt Defendants' overpromotion of Yaz was so severe that it required Bayer to run new TV advertisements to correct the previous misleading Yaz advertisements regarding acne and premenstrual syndrome.

78. Bayer ultimately agreed to spend at least $20 million on corrective TV advertisements and to submit all Yaz advertisements to the FDA for advanced screening for the next six years.

79. On May 31, 2011 the Federal Drug Administration (FDA) issued a Safety Announcement that the FDA was concerned about the potential increased risk of blood clots with the use of drospirenone-containing birth control pills. The FDA advised healthcare professionals to counsel patients about the risk of Venous thromboembolism.

80. On September 26, 2011 the Federal Drug Administration (FDA) issued a Safety Announcement that the FDA was concerned about the potential increased risk of blood clots with the use of drospirenone-containing birth control pills. The FDA reported that the preliminary results

of an FDA funded study suggested an approximately 1.5 fold increase in the risk of blood closts for women who use drospirenone-containing birth control pills compared to users of other hormonal contraceptives.  The FDA provided additional information for patients and additional information for healthcare professionals.  The FDA advised healthcare professionals to counsel patients about the risk of Venous thromboembolism, and the increased risk of VTE in women who are obese.

81. On April 10, 2012,  the FDA updatd the Drug Safety Communication about birth control pills containing drospirenone to advise that women with a history of heart attack should not take these birth control pills.

82. On April 2, 2012, Angela Holland was prescribed the birth control pill Yaz.  On that same day, Angela Holland began taking the generic alternative Gianvi.

83. On April 25, 2012, Ms. Holland experienced significant distress at work and at approximately 5:45 pm an ambulance was called to transport Ms. Holland to the hospital.

84. On April 25, 2012, DC EMS responded to Ms. Holland assessed and stabilized her for transport to GW Hospital. Ms. Holland arrived at GW ER at approximately 6:15 pm.

85. On April 25, 2012, MS. Holland was evaluated in the GW ER where her condition deteriorated to cardiac arrest. Prior to her arrest, Ms. Holland's distress was evident by her unstable vital signs, moans by the patient and severe respiratory distress. The diagnostic impression was pulmonary embolism which was later confirmed by diagnostic testing.

86. On April 25, 2012, Ms. Holland was admitted to ICU on ECMO in critical condition. Her clinical course was complicated by vascular injury and bleeding.

87. On April 28, 2012 she died from medical complications causally related to the oral contraceptive.

88. Due to the negligent acts and/or omissions of the Defendants, Angela Holland, her estate, and/or her heirs incurred medical and hospital expenses as well as loss of income including, but not limited to:

      a.   Lost income reduced to present value $3,143,085

      b.   DCFEMS - $521.10

      c.   George Washington University Hospital - $262,125.50

      d.   Medical Faculty Associates - $33,315.24

      e.   Funeral expenses - $18,245.72

## COUNT I
### (Negligence)

89. Plaintiffs incorporate by reference all other allegations in the Complaint.

90. Defendants, directly or indirectly, negligently and/or defectively designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied, distributed and/or otherwise placed Yaz/Yasmin/Gianvi into the stream of commerce.

91. At all times material hereto, Defendants had a duty to Angela Holland and other users and/or consumers of Yaz/Yasmin/Gianvi to exercise reasonable care in the design, testing, inspection, manufacture, assembly, development, labeling, sterilization, licensing, marketing, advertising, promotion, sale, packaging, supply and/or distribution of Yaz/Yasmin/Gianvi.

92. Defendants breached that duty and were negligent in the design, testing, inspection, manufacture, assembly, development, labeling, sterilization, licensing, marketing, advertising, promotion, sale, packaging, supply and/or distribution of Yaz/Yasmin/Gianvi in that: Y Yaz/Yasmin/Gianvi were defective when put on the market by Defendants; that with such defect, Yaz/Yasmin/Gianvi were reasonably certain to be dangerous when put to normal use; and that

Defendants failed to use reasonable care in designing or making Yaz/Yasmin/Gianvi or in inspecting it for defects. Specifically, Defendants breached their duty by, among other things:

a. Failing to include adequate warnings that would alert the medical, pharmaceutical and/or scientific communities and users and/or consumers of the drug, including Plaintiff and the Plaintiff's decedent, to the potential risks and serious side effects of the drug;

b. Failing to adequately and properly test and inspect the drug before placing the drug on the market;

c. Failing to conduct sufficient testing and inspection of the drug which, if properly performed, would have shown that the drug had serious side effects, including but not limited to, pulmonary embolus, deep venous thrombosis and/or death and other serious and life threatening side effects;

d. Failing to adequately warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff and Plaintiff's decedent, of the potential risks and other serious side effects associated with the drug, including, among other things, pulmonary embolus, deep venous thrombosis and/or death and other serious and life threatening side effects;

e. Failing to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risks associated with the use of the drug;

f. Failing to timely recall and/or timely remove the drug from the stream of commerce despite the fact that Defendants knew or should have known of the

defective and unreasonably dangerous nature of the drug, including the significant

health risks associated with the use of the drug; and

g.  Encouraging misuse and overuse while failing to disclose the side effects of the

drug to the medical, pharmaceutical and/or scientific communities, and users

and/or consumers, including Plaintiff and Plaintiff's decedent, in order to

maximize profit from sales.

93. Defendants knew or should have known that Yaz/Yasmin/Gianvi caused

unreasonably dangerous risks and serious side effects of which users and/or consumers of the

drug, including Plaintiff, were not aware. Defendants nevertheless advertised, promoted,

marketed, sold, distributed and/or supplied Yaz/Yasmin/Gianvi knowing that there were safer

methods for contraception and for the treatment of irregular menstrual cycles and dysmenorrhea.

94. As a direct and proximate result of the Defendants' wrongful acts and/or omissions,

Angela Holland suffered deep vein thrombosis and sustained a fatal pulmonary embolism.

## COUNT II
### (Strict Liability-Manufacturing/Design Defect, Failure to Warn)

95. Plaintiffs incorporate by reference all other allegations in the Complaint.

96. At all times herein mentioned, the Defendants designed, researched, manufactured,

tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the

Defendants who have designed, researched, manufactured, tested, advertised, promoted,

marketed, sold and distributed Yaz/Yasmin/Gianvi as hereinabove described that was used by

Angela Holland.

97. At those times, Yaz/Yasmin/Gianvi was expected to and did reach the usual

consumers, handlers, and persons coming into contact with said product without substantial

change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

98. At those times, Yaz/Yasmin/Gianvi was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Angela Holland.

99. Yaz/Yasmin/Gianvi is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

100. At all times material to this action, Yaz/Yasmin/Gianvi was expected to reach, and did reach, consumers in the District of Columbia and throughout the United States, including Angela Holland, without substantial change in the condition in which it was sold.

101. Angela Holland was prescribed and used the subject product for its intended purpose.

102. Defendants created a product unreasonably dangerous for its normal, intended use.

103. Defendants knew, or should have known that at all times herein mentioned its Yaz/Yasmin/Gianvi was in a defective condition, and was and is inherently dangerous and unsafe.

104. Defendants, with this knowledge, voluntarily designed its Yaz/Yasmin/Gianvi in a dangerous condition for use by the public, and in particular Angela Holland.

105. In addition, at the time the subject product left the control of the Defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Angela Holland's injuries without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and

technologically feasible, and would have prevented or significantly reduced the risk of Angela

Holland's injuries without substantially impairing the product's utility.

106.    Defendants designed, researched, manufactured, tested, advertised, promoted,

marketed, sold and distributed a defective product which created an unreasonable risk to the

health of consumers and to Angela Holland, in particular, and Defendants are therefore strictly

liable for the injuries sustained by Angela Holland.

107.    At all times material to this action, Yaz/Yasmin/Gianvi was designed, developed,

manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by

Defendants in a defective and unreasonably dangerous condition at the time it was placed in the

stream of commerce in ways which include, but are not limited to, one or more of the following

particulars:

    a.    When placed in the stream of commerce, Yaz/Yasmin/Gianvi contained

unreasonably dangerous design defects and was not reasonably safe as intended to

be used, subjecting the Angela Holland to risks that exceeded the benefits of the

subject product, including but not limited to the risks of heart arrhythmias,

myocardial infarctions, and other adverse cardiovascular events, including, stroke,

transient ischemic attack, blood clots, embolisms, kidney and gallbladder disease

and/or sudden death, as well as other severe and personal injuries which are

permanent and lasting in nature;

    b.    When placed in the stream of commerce, Yaz/Yasmin/Gianvi was defective in

design and formulation, making the use of Yaz/Yasmin/Gianvi more dangerous

than an ordinary consumer would expect, and more dangerous than other risks

associated with the other contraceptive medications and similar drugs on the market for the prevention of pregnancy;

c.   The subject product's design defects existed before it left the control of the Defendants;

d.   Yaz/Yasmin/Gianvi was insufficiently tested;

e.   Yaz/Yasmin/Gianvi caused harmful side effects that outweighed any potential utility; and

f.   Yaz/Yasmin/Gianvi was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including Angela Holland, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Defendants strictly liable to Angela Holland.

108.   At all times material to this action, Yaz/Yasmin/Gianvi was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a.   When placed in the stream of commerce, Yaz/Yasmin/Gianvi contained manufacturing defects which rendered the product unreasonably dangerous;

b.   The subject product's manufacturing defects occurred while the product was in the possession and control of the Defendants;

c.   The subject product was not made in accordance with the Defendants' specifications or performance standards; and

d.   The subject product's manufacturing defects existed before it left the control of the Defendants.

109.   The Defendants, as manufacturers and/or distributors of the subject prescription product, are held to the level of knowledge of an expert in the field.

110.   The warnings that were given by the Defendants were not accurate, clear and/or were ambiguous.

111.   The warnings that were given by the Defendants failed to properly warn physicians of the increased risks of heart arrhythmias, myocardial infarctions, and other adverse cardiovascular events, including, stroke, transient ischemic attack, blood clots, embolisms, kidney and gallbladder disease and/or sudden death, as well as other severe and personal injuries which are permanent and lasting in nature.

112.   The Plaintiff, individually and through her prescribing physician, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

113.   The Defendants had a continuing duty to warn the Plaintiff of the dangers associated with the subject product.

114.   By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Yaz/Yasmin/Gianvi.

115.   Defendants' inadequate warnings of Yaz/Yasmin/Gianvi were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

116.   That said defects in Defendants' drug Yaz/Yasmin/Gianvi were a substantial factor in causing Plaintiff's injuries.

117.    Had the Plaintiff received adequate warnings regarding the risks of the subject product, she would not have used it.

118.    As a direct and proximate result of the Defendants' wrongful acts and/or omissions, Angela Holland suffered deep vein thrombosis and sustained a fatal pulmonary embolism.

**COUNT III**
**(Breach of Express and Implied Warranties)**

119.    Plaintiff incorporates by reference all other allegations in the Complaint.

120.    Defendants expressly warranted that Yaz/Yasmin/Gianvi was safe and well accepted by users.

121.    The combination oral contraceptive Yaz/Yasmin/Gianvi does not conform to these express representations because Yaz/Yasmin/Gianvi is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendants.

122.    Angela Holland did rely on the express warranties of the Defendants herein.

123.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Yaz/Yasmin/Gianvi in recommending, prescribing, and/or dispensing Yaz/Yasmin/Gianvi.

124.    The Defendants herein breached the aforesaid express warranties, as their drug Yaz/Yasmin/Gianvi was defective.

125.    Defendants expressly represented to Angela Holland, her physicians, healthcare providers, and/or the FDA that Yaz/Yasmin/Gianvi was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of combination oral contraceptives, that the side

effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

126.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Yaz/Yasmin/Gianvi was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

127.    At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Yaz/Yasmin/Gianvi and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Yaz/Yasmin/Gianvi, for use in contraception.

128.    At the time Defendants marketed, sold, and distributed Yaz/Yasmin/Gianvi for use by Angela Holland, Defendants knew of the use for which Yaz/Yasmin/Gianvi was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

129.    The Defendants impliedly represented and warranted to the users of Yaz/Yasmin/Gianvi and their physicians, healthcare providers, and/or the FDA that Yaz/Yasmin/Gianvi was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

130.    That said representations and warranties aforementioned were false, misleading, and inaccurate in that Yaz/Yasmin/Gianvi was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

131.    Angela Holland and/or members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

132.    Angela Holland and her physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Yaz/Yasmin/Gianvi was of merchantable quality and safe and fit for its intended use.

133.    The combination oral contraceptive Yaz/Yasmin/Gianvi was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

134.    The Defendants herein breached the aforesaid implied warranties, as their drug Yaz/Yasmin/Gianvi was not fit for its intended purposes and uses.

135.    As a direct and proximate result of the breach of these warranties Angela Holland suffered deep vein thrombosis and sustained a fatal pulmonary embolism.

**COUNT IV**
**(D.C. Consumer Protection Procedures Act)**

136.    Plaintiffs incorporate all other paragraphs in the complaint.

137.    Defendants, its employees, agents, and/or servants were required to follow the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* (hereinafter "Consumer Protection Act").

138.    Angela Holland was a consumers as defined under the Consumer Protection Act

139.    Defendants were merchants as defined under the Consumer Protection Act.

140.    Defendants violated the Consumer Protection Act by committing unlawful trade practices.

141.    Defendants' violations of the Consumer Protection Act include, but are not limited to: (1) misrepresenting material facts which had a tendency to mislead; (2) failing to state material facts when such failure tends to mislead; (3) failing to fulfill its warranties, failing to use trained installers, failing to use safe installation techniques, failing to timely repair damage caused by the installer; and (4) such other violations as may be uncovered during discovery.

142.    Defendants used deception, fraud, false promise, misrepresentation, and/or unfair practices in their packaging, labeling, distributing, marketing, promoting and selling of Yaz/Yasmin/Gianvi in the District of Columbia. Defendants concealed, suppressed, and/or omitted material facts about the safety of Yaz/Yasmin/Gianvi in connection with its sale and/or advertisement in the District of Columbia.

143.    Defendants' practice of promoting Yaz/Yasmin/Gianvi created and/or reinforced a false impression as to its safety and placed all Yaz/Yasmin/Gianvi consumers at risk for serious injury and potentially lethal side effects. Defendants' statements and omissions were made with the intent that the Plaintiff and her prescribing physician would rely on such statements and omissions.

144.    The Plaintiff purchased and used Yaz/Yasmin/Gianvi for personal purposes and suffered an ascertainable loss of money as a result of Defendants' use or employment of the unlawful methods, acts or practices alleged herein.

145.    As a direct and proximate result of the Defendants' wrongful acts and/or omissions, Angela Holland suffered deep vein thrombosis and sustained a fatal pulmonary embolism.

## COUNT V
### (Survival Action)

146.    Plaintiff incorporates by reference all other allegations in the Complaint  and further alleges that this action arises under the District of Columbia Survival Statute, Title 12, §101 *et seq.* of the District of Columbia Code, and is brought by Burnell and Marilyn Holland as the personal representatives of the Estate of Angela Holland.

147.    As a direct and proximate result of the Defendants' negligent acts and omissions, the estate of the decedent has been deprived of all probable future earnings of the decedent.

148.    As a further direct and proximate result of the negligent acts and omissions of the defendant the decedent sustained permanent injuries, mental anguish, and pain and suffering prior to her death.

## COUNT VI
### (Wrongful Death)

149.    Plaintiffs incorporate by reference all other paragraphs in this Complaint.

150.    Plaintiffs further allege that this action arises under Title 16, § 2701 *et seq.* of the District of Columbia Code, and is brought by Burnell and Marilyn Holland as the personal and legal representatives of the Estate of Angela Holland.

151.    The above-referenced acts and omissions were the proximate cause of Angela Holland's death.

152.    As a result of the negligent acts and/or omissions of the Defendants, the Estate of Angela Holland and the heirs of Angela Holland have incurred medical bills, the expense of burial, and loss of income.

153.    As a direct and proximate cause of the negligent acts and omissions of the Defendants, Angela Holland suffered extreme conscious physical, mental, and emotional pain and suffering as well as pre-impact fright.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in the full and just amount of Ten Million Dollars ($10,000,000.00) plus costs, interest, attorney's fees where permitted, treble damages, and any other relief as may be deemed appropriate by the Court.

Respectfully Submitted,

By:    _Kelly Fisher_

William P. Lightfoot #313593
Paulette E. Chapman #416437
Kelly J. Fisher #488431
KOONZ, McKENNEY, JOHNSON,
  DePAOLIS & LIGHTFOOT, LLP
2001 Pennsylvania Avenue, N.W., Suite 450
Washington, D.C. 20006
202-659-5500
202-785-3719 (fax)
wlightfoot@koonz.com

Attorney for Plaintiffs

JURY TRIAL DEMANDED:

_Kelly Fisher_

Kelly J. Fisher